Filed 12/13/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STANLEY WILSON, | B264944 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC 559720) |
| v. | |
| CABLE NEWS NETWORK, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mel Red Recana, Judge. Reversed.

Law Offices of Lisa L. Maki, Lisa L. Maki, Jill McDonell, Jennifer Ostertag; Shegerian & Associates and Carney R. Shegerian for Plaintiff and Appellant.

Mitchell Silberberg & Knupp, Adam Levin and Jolene Konnersman for Defendants and Respondents.

Davis Wright Tremaine, Kelli L. Sager, Rochelle Wilcox, and Dan Laidman for Los Angeles Times Communications LLC, CBS Corporation, NBCUniversal Media, LLC, ABC, Inc., Fox Networks Group, Inc., and The California Newspaper Publishers Association as Amici Curiae on behalf of Defendants and Respondents.

_____

The trial court granted defendants' anti-SLAPP motion (Code Civ. Proc., § 425.16[1]) against a former employee alleging discrimination, retaliation, wrongful termination, and defamation. Plaintiff contends the defendants' conduct and statement did not arise from an act in furtherance of their right of free speech or to petition for redress of grievances, and were not in connection with an issue of public interest, and therefore fell outside the scope of the anti-SLAPP statute. We agree and reverse. This is a private employment discrimination and retaliation case, not an action designed to prevent defendants from exercising their First Amendment rights. Defendants may have a legitimate defense but the merits of that defense should be resolved through the normal litigation process, with the benefit of discovery, and not at the initial phase of this action.

## BACKGROUND

### 1. Plaintiff's complaint

In his complaint filed in October of 2014, plaintiff alleges he is a 51-year-old African- and Latino-American who worked for Cable News Network, Inc., CNN America, Inc., Turner Services, Inc., and Turner Broadcasting System, Inc. (CNN) from 1996 through January 28, 2014. He became a producer in 2000 and was promoted to the "Producer II" rank in 2003. Throughout his employment with CNN, plaintiff produced "stories, investigative reports, and live remote coverage, including breaking news, political coverage, and documentary programs." He also "contributed to CNN.com with original stories and companion pieces to support reporter packages." Plaintiff received "above-satisfactory" performance reviews for the entire duration of his employment at CNN and also received numerous awards for breaking news, investigative reporting, and documentary programs, including Associated Press and Emmy awards.

The complaint alleges that defendant Peter Janos, who never liked plaintiff, was promoted to CNN western regional bureau chief in 2004 and became plaintiff's immediate or general supervisor. Plaintiff thereafter received no further promotions, even though he applied for a dozen openings. He alleges Janos intervened to prevent him

---

[1] Undesignated statutory references pertain to the Code of Civil Procedure.

2

from being selected for any of those positions. The final opening at CNN for which plaintiff applied was as a producer at the White House. Plaintiff requested Janos's endorsement for the position, but Janos refused. The job was offered to a younger, Caucasian candidate with less experience.

The complaint alleges that beginning in 2004 plaintiff repeatedly complained to the Los Angeles deputy bureau chief and senior vice-president of human resources about CNN's failure to promote African-American men. No investigation or corrective action resulted from plaintiff's complaints. In 2005 plaintiff made a written complaint to Janos "about the culture of blame or condemnation of CNN colleagues when technical mistakes occur." "In retaliation, Janos issued Plaintiff a 'Written Warning Regarding Performance.' "

In 2010 plaintiff's wife began "expensive fertility treatments" paid for by plaintiff's CNN-provided health insurance. The complaint alleges that the infertility of plaintiff's wife constituted a disability within the scope of Government Code section 12926, subdivision (k).[2] CNN asked plaintiff to keep its human resources manager apprised of the treatments. Plaintiff's wife eventually became pregnant and had twins in September of 2013. Plaintiff took five weeks of paternity leave.

The complaint alleges that upon plaintiff's return from paternity leave, Janos gave high-profile assignments to Jack Hannah, a younger Caucasian man with less experience than plaintiff who only recently had been promoted to producer, while often relegating plaintiff to "in-house packaging and fill-in work on the Assignment Desk." The complaint alleges Janos did this both as a step toward replacing plaintiff "because of his . . . age, race, color, association with a disabled person, and ancestry" and in retaliation for taking paternity leave and complaining about discrimination in the workplace. When

---

[2] Plaintiff apparently referred to a prior version of the statute. Since January 1, 2014, subdivision (m) of Government Code section 12926 defines " 'Physical disability' " for purposes of Government Code section 12940.

plaintiff complained, Janos "told Plaintiff that he needed to step up his work load and keep up with Hannah."

On January 7, 2014, plaintiff was assigned to cover a press conference regarding Sheriff Lee Baca's retirement. Plaintiff submitted a story for "copy edit," and the editor, with whom plaintiff had not worked before, expressed concern over three sentences that she said required attribution because they were too similar to another report. The editor informed Janos, who, without talking to plaintiff, decided not to publish the story. Over the next two days Janos refused to listen to plaintiff's explanation, told him there would be "consequences," initiated an audit of plaintiff's work, and placed plaintiff on leave of absence.

On January 28, 2014, Janos fired plaintiff. Nothing was said about any audit findings. The complaint alleges the stated reasons were pretext and the real reasons were discrimination and retaliation. It further alleges plaintiff was replaced by a less experienced Caucasian under the age of 40. Plaintiff was thereafter unable to find work in broadcast journalism, and he alleged that defendants "have purposely published to third parties, including prospective employers, [knowingly] false statements accusing Plaintiff of dishonesty in his profession," thereby irreparably damaging his reputation.

The first cause of action in the complaint alleges employment discrimination on the basis of age, race, color, ancestry, and association with a person with a disability, through the acts of "denial of promotions, assignment to menial tasks, refusal to investigate discrimination and retaliation, failure to remedy or prevent discrimination and retaliation, termination, and defamation."

Plaintiff's second cause of action is retaliation (through the same acts) for protected activities, including taking paternity leave and complaining about defendants' discriminatory conduct.

Plaintiff's third cause of action alleges that the same acts violated Government Code section 12945.2 because they were substantially motivated by his paternity leave.

4

The fourth cause of action alleges failure to take all reasonable steps necessary to prevent discrimination and retaliation. (Gov. Code, § 12940, subd. (k).)

The fifth cause of action alleges wrongful termination in violation of public policy, based upon the aforementioned discrimination and retaliation.

The sixth cause of action, for declaratory relief, seeks a declaration "that Defendants discriminated and retaliated against him on the basis of age, race, color, ancestry, association with a disabled woman, engagement in protected activity, and/or some combination of these protected characteristics."

Plaintiff's seventh cause of action is defamation. It alleges defendants published the following statement with knowledge of its falsity: "that Plaintiff had plagiarized the passages in the Baca story and thereby violated CNN standards and practices."

## 2. Defendants' anti-SLAPP motion

After answering the complaint, defendants filed a special motion to strike all causes of action pursuant to section 425.16, also known as an anti-SLAPP motion.

As part of their evidentiary showing, defendants provided an e-mail from Cathy Straight, the copy editor who raised concerns about plaintiff's story on Baca's retirement. The e-mail included three excerpts from plaintiff's article and three corresponding excerpts from a Los Angeles Times article, with the similar passages in controversy in boldface. The first of these in plaintiff's article was "who spent 48 years with the department, including 15 as sheriff"; the Times article had identical text, minus the comma. The second controversial segment in plaintiff's article stated, "The news of Baca's decision to step down startled people inside and outside the agency. He was engaged in a tough re-election battle amid several scandals that had plagued the department." The Times article stated, "The news of Baca's decision to step down stunned people inside and outside the agency. He was locked in a tough reelection battle amid several scandals that had beset the department." The third passage in issue in plaintiff's article stated, "Last year, the U.S. Department of Justice also accused sheriff's deputies of engaging in widespread unlawful searches of homes, improper detentions,

5

unreasonable force and a systematic effort to discriminate against African Americans who received low-income, subsidized housing in the Antelope Valley section of Los Angeles." The comparable segment of the Times article was, "Last year, the U.S. Department of Justice accused sheriff's deputies of engaging in widespread unlawful searches of homes, improper detentions and unreasonable force as Antelope Valley authorities conducted a systematic effort to discriminate against African Americans who received low-income subsidized housing." Plaintiff's entire article is not in the appellate record.

The trial court granted the motion in its entirety, and plaintiff appealed.

## DISCUSSION

**1.       Pertinent principles regarding anti-SLAPP motions**

       **a.       Statutory framework**

The Legislature enacted section 425.16, the anti-SLAPP statute, "out of concern over 'a disturbing increase' " in civil suits "aimed at preventing citizens from exercising their political rights or punishing those who have done so." (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21.) "The quintessential SLAPP is filed by an economic powerhouse to dissuade its opponent from exercising its constitutional right to free speech or to petition. The objective of the litigation is not to prevail but to exact enough financial pain to induce forbearance." (*Nam v. Regents of the University of California* (2016) 1 Cal.App.5th 1176, 1193 (*Nam*).) Nonetheless, the statute expressly provides that it is to be broadly construed, and it thus may apply to suits bearing little resemblance to the quintessential SLAPP. (§ 425.16, subd. (a); *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 894 (*Wilbanks*).)

The statute provides for a special motion to strike that entails a two-step process. First, the defendant must make a prima facie showing that the plaintiff's cause of action arises from an act by the defendant in furtherance of the defendant's right of petition or free speech in connection with a public issue. (§ 425.16, subd. (b)(1).) If the defendant succeeds in making this showing, the court must then consider whether the plaintiff has

6

demonstrated a probability of prevailing on the claim.  (*Ibid*.)  If not, the motion should be granted.  (*Ibid*.)  In ruling on the motion, "the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."  (§ 425.16, subd. (b)(2).)  However, the pleaded facts must be accepted as true.  (*Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 54 (*Young*).)  "An anti-SLAPP motion is brought against a 'cause of action' or 'claim' alleged to arise from protected activity.  [Citation.]  The question is what is pled—not what is proven."  (*Comstock v. Aber* (2012) 212 Cal.App.4th 931, 942 (*Comstock*).)  The defendant's evidence is considered for whether, as a matter of law, it defeats the evidence submitted by the plaintiff, which must be accepted as true.  (*Young*, at p. 54.)  "We do not resolve the merits of the overall dispute, but rather identify whether its pleaded facts fall within the statutory purpose, 'to prevent and deter "lawsuits . . . brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." ' "  (*Ibid*.)

Subdivision (e) of section 425.16 sets forth various categories constituting an " 'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue,' " including "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e)(4).)

**b.      Determining the applicability of the statute to a cause of action**

To determine whether a cause of action arises from protected activity, we disregard its label and instead examine its gravamen "by identifying '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim' " (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272), i.e., " 'the *acts on which liability is based*,' " not the damage flowing from that conduct.  (*Renewable Resources Coalition, Inc. v. Pebble Mines Corp.* (2013) 218 Cal.App.4th 384, 396–397.)  "[T]he defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech."  (*City of*

7

*Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*City of Cotati*).) Mere "collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute." (*Hylton*, at p. 1272.)

The trial court must "distinguish between (1) speech or petitioning activity that is mere *evidence* related to liability and (2) liability that is *based on* speech or petitioning activity. Prelitigation communications . . . may provide evidentiary support for the complaint without being a basis of liability." (*Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207, 1214–1215.) "[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute. [Citation.] Moreover, that a cause of action arguably may have been 'triggered' by protected activity does not entail that it is one arising from such." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).) Thus, the statute does not automatically apply simply because the complaint refers to some protected speech activities. (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188 (*Martinez*).)

c.     **Determining whether a matter is a public issue or an issue of public interest**

"The statute does not provide a definition for 'an issue of public interest,' and it is doubtful an all-encompassing definition could be provided. However, the statute requires that there be some attributes of the issue which make it one of public, rather than merely private, interest. A few guiding principles may be derived from decisional authorities. First, 'public interest' does not equate with mere curiosity. [Citations.] Second, a matter of public interest should be something of concern to a substantial number of people. [Citation.] Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. [Citations.] Third, there should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation]. Fourth, the focus of the speaker's conduct should be the public interest rather

8

than a mere effort 'to gather ammunition for another round of [private] controversy . . . .' [Citation.] . . . A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people." (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133.)

Three general categories of cases have been held to concern an issue of public interest or a public issue: "(1) The subject of the statement or activity precipitating the claim was a person or entity in the public eye. [Citations.] [¶] (2) The statement or activity precipitating the claim involved conduct that could affect large numbers of people beyond the direct participants. [Citations.] [¶] (3) The statement or activity precipitating the claim involved a topic of widespread public interest." (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 33 (*Commonwealth*).) "As to the latter, it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 898.) An issue of public interest must "go beyond the parochial particulars of the given parties." (*Commonwealth*, at p. 34.) Thus, "[j]ust because you are selling something that is intrinsically important does not mean that the public is interested in the fact that you are selling it." (*Ibid.*) "The part is not synonymous with the greater whole." (*Ibid.*)

"[I]n cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119.)

d.      **Standard of review**

We review the trial court's ruling on an anti-SLAPP motion de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) We do not weigh credibility or determine the weight

9

of the evidence, but instead accept as true the evidence favorable to the plaintiff and evaluate the defendant's evidence only to determine if it defeats that submitted by the plaintiff as a matter of law. (*Id.* at p. 326.)

## 2. The trial court erred by granting the anti-SLAPP motion.

### a. First through sixth causes of action

With respect to his "employment-related claims," i.e., those alleging discrimination, retaliation, wrongful termination in violation of public policy, and failure to prevent discrimination, retaliation and harassment, plaintiff contends that defendants' "behind-the-scene treatment of a behind-the-scene producer" is neither in furtherance of defendants' free speech nor in connection with a matter of public interest. Defendants, in contrast, argue that because CNN is a news provider, all of its "staffing decisions" regarding plaintiff were part of its "editorial discretion" and "so inextricably linked with the content of the news that the decisions themselves" are acts in furtherance of CNN's right of free speech that were "necessarily 'in connection' with a matter of public interest—news stories relating to current events and matter[s] of interest to CNN's news consumers." They further argue their alleged discriminatory "motive" is irrelevant to the ruling on the anti-SLAPP motion. As we will explain, we agree with plaintiff that the discrimination and retaliation he has alleged are not acts in furtherance of defendants' free speech rights.

Undoubtedly, a producer or writer shapes the way in which news is reported. Thus, defendants' choice of who works as a producer or writer is arguably an act in furtherance of defendants' right of free speech. But this does not mean that defendants' alleged discrimination and retaliation against plaintiff—a long-term, well-reviewed existing employee that CNN had already deemed qualified and acceptable to shape its news reporting—was also an act in furtherance of its speech rights.

An examination of the authorities upon which defendants base their argument that their alleged discriminatory and retaliatory "motives" are irrelevant reveals no support for the treatment of employment discrimination or retaliation as a mere motive of no

10

consequence to the determination of the applicability of section 425.16.  As noted in the recent *Nam* case, which was an employment case alleging sexual harassment and retaliation:  "Defendant insists that motive is irrelevant in assessing the merits of an anti-SLAPP motion to strike.  It is true the Supreme Court, honoring the legislative mandate to broadly construe the anti-SLAPP statute in order to curtail abusive SLAPP's, instructs lower courts to focus on whether the gravamen of the action is based on protected conduct and to ignore the question whether the SLAPPer subjectively intended to chill the protected conduct.  (*Navellier*, *supra*, 29 Cal.4th at p. 94; *Equilon* [*Enterprises v. Consumer Cause, Inc.* (2002)] 29 Cal.4th [53,] 58–59.)  In other words, the victim of a SLAPP has no burden to prove either that the SLAPPer intended to chill the exercise of its constitutional rights or that the exercise of the protected acts actually was chilled.  And it is also true that defendant's argument finds some support in *Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 268–269 (*Tuszynska*) and *Hunter v. CBS Broadcasting, Inc.* (2013) 221 Cal.App.4th 1510, 1520 (*Hunter*), wherein the Courts of Appeal translated subjective intent to mean motive and the mens rea of the SLAPPer [plaintiff] to mean the mens rea of the defendant employer.  But equating a SLAPPer's subjective intent in filing the litigation to an employer's *motive* in subjecting an employee to a retaliatory grievance procedure is a mistake and does violence to the purpose of both the anti-SLAPP and antiretaliation laws."  (*Nam*, *supra*, 1 Cal.App.5th at p. 1187.)

"Both the *Tuszynska* and *Hunter* courts purportedly based their conclusions that the employer's motive to discriminate was irrelevant in determining whether the defendant met its threshold burden to prove the conduct arose from protected activity on the Supreme Court's holding in *Navellier*.  *Navellier*, however, did not involve harassment, discrimination, or retaliation.  Nor did the Supreme Court address the defendant's subjective intent.  Quite to the contrary, the Supreme Court determined that the SLAPPer's, not the defendant's, intent was irrelevant.  Thus, in our view, *Navellier* does not require us to ignore the defendant's alleged motive in a harassment, discrimination, or retaliation case."  (*Nam*, *supra*, 1 Cal.App.5th at pp. 1188–1189.)

11

Moreover, "a cause of action can only be said to arise from protected conduct if it alleges at least one *wrongful* act—conduct allegedly *breaching a duty and thereby injuring the plaintiff*—that falls within the act's definition of protected conduct." (*Old Republic Construction Program Group v. The Boccardo Law Firm, Inc.* (2014) 230 Cal.App.4th 859, 869.) In the typical employment discrimination or retaliation case involving at-will employees, the conduct breaching a duty *is* the discrimination or retaliation because an employer's firing, failure to promote, demotion, etc. breaches no duty to an at-will employee. Here, where plaintiff does not allege an employment contract and was employed by a private corporation, not a governmental entity, the only reason the defendants' failure to promote and firing of plaintiff are actionable is that they were allegedly acts of discrimination and retaliation. Absent these "motivations," Wilson's employment-related claims would not state a cause of action and defendants no doubt would have demurred, not filed an answer and anti-SLAPP motion. Discrimination and retaliation are not simply motivations for defendants' conduct, they *are* the defendants' conduct.

As the *Nam* court stated: "To conclude otherwise would subject most, if not all, harassment, discrimination, and retaliation cases to motions to strike. . . . Such a result is at odds with the purpose of the anti-SLAPP law, which was designed to ferret out meritless lawsuits intended to quell the free exercise of First Amendment rights, not to burden victims of discrimination and retaliation with an earlier and heavier burden of proof than other civil litigants and dissuade the exercise of *their* right to petition for fear of an onerous attorney fee award." (*Nam*, *supra*, 1 Cal.App.5th at p. 1189, italics added.)

*Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611 provides additional support for viewing discrimination and retaliation as the acts upon which liability is premised, not mere motivations for actions—such as denial of promotions— through which discrimination and retaliation are manifested. There, the appellate court rejected application of section 425.16 to a complaint by an employee alleging his former supervisor and employer engaged in racial discrimination and retaliation against him

12

through acts such as undermining his authority, giving him a poor performance review, and effectively demoting him. (198 Cal.App.4th at pp. 617–618.) The appellate court concluded that "the pleadings establish that the gravamen of plaintiff's action against defendants was one of racial and retaliatory discrimination" (*id.* at p. 625) and upheld denial of the anti-SLAPP motion.

As previously noted, *Hunter*, *supra*, 221 Cal.App.4th 1510, upon which defendants principally rely, adopted the erroneous view that discrimination is merely a motive and the erroneous principle, derived ultimately from a misreading of *Navellier* in *Tuszynska*, *supra*, 199 Cal.App.4th at pages 268–269, that a defendant's motives are always irrelevant to a determination of whether the defendant's acts were in furtherance of its free speech or petitioning rights. (221 Cal.App.4th at pp. 1521–1523.)

Accordingly, we conclude that the gravamen of plaintiff's employment-related causes of action was defendants' allegedly discriminatory and retaliatory conduct against him, not the particular manifestations of the discrimination and retaliation, such as denying promotions, assigning him menial tasks, and firing him. Further, we reject defendants' characterization of their allegedly discriminatory and retaliatory conduct as mere "staffing decisions" in furtherance of their free speech rights to determine who shapes the way they present news. The press has no special immunity from generally applicable laws. (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 755; *Mabee v. White Plains Pub. Co.* (1946) 327 U.S. 178, 184.)

As previously noted, "[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute." (*Navellier*, *supra*, 29 Cal.4th at p. 89.) Moreover, the statute does not automatically apply simply because the complaint refers to some protected speech activities. (*Martinez*, *supra*, 113 Cal.App.4th at p. 188.) The dissent contends that the majority "conflates" the first and second prongs of the SLAPP statute. Not true. Rather, we must accept (*Young*, *supra*, 210 Cal.App.4th at p. 54; *Comstock*, *supra*, 212 Cal.App.4th at p. 942) Wilson's allegations that beginning in 2004 and continuing

13

thereafter, he was subject to discrimination, harassment and retaliation because, inter alia, he was African American and disliked by his superiors. He alleges that he repeatedly complained of his circumstances to no avail. Viewed from this perspective, Wilson alleges causes of actions that neither implicate CNN's First Amendment rights nor are a matter of public interest.

"The critical issue concerns whether 'the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech.'" (*Gotterba v. Travolta* (2016) 228 Cal.App.4th 35, 42, quoting *City of Cotati*, *supra*, 29 Cal.4th at p. 78.) Here, plaintiff's causes of action do not. CNN's actions in 2014 premised upon the alleged plagiarism concerning Sheriff Baca are not the basis of Wilson's claims that CNN subjected him to discrimination, harassment and retaliation before he even wrote the Baca report. If we accept CNN's argument as to the first prong, we must necessarily disregard what Wilson has alleged CNN did for a decade prior to his termination—conduct that was not a matter of public interest and could not be justified on the basis of CNN's status as a news entity. Obviously, CNN could not argue that because it is a news agency it is allowed to discriminate, harass, or retaliate against its employees on grounds such as race, ethnicity, color, age, etc.

Accordingly, the section 425.16 motion was improperly granted with respect to the first through sixth causes of action.

### b.    Defamation cause of action

There is also no connection between the defendants' allegedly defamatory statements about plaintiff and a public issue or issue of public interest.

First, the record does not show that plaintiff was a person in the public eye. He was a producer and Web article writer, not a reporter appearing on camera. In his declaration submitted in opposition to the anti-SLAPP motion, plaintiff described his duties as follows: "working with correspondents and managers to carry out and generate story ideas for air; researching; news gathering; producing live shots for air; post-production; . . . writing for the CNN Wire desk (later called CNN.com), which was a

14

comparatively small percentage of my work by comparison to my television producing";
and "pitching and producing long-form documentary programs."  Plaintiff added, "I was
not a reporter on air and had only one brief interview as a reporter where I was actually
shown on TV."  While the complaint and plaintiff's declaration assert that he had
produced popular documentaries and received awards from peers, nothing indicates the
public would know who plaintiff was.  Plaintiff's role in shaping the news CNN
broadcast was hidden from public view, unlike the local television "weather news
anchor" role sought by the plaintiff in *Hunter*, *supra*, 221 Cal.App.4th 1510, upon which
defendants principally rely.  There, the television stations submitted evidence that the
principal reason viewers watched local news broadcasts was to obtain information about
the weather, and this resulted in "weather anchors" becoming " 'local celebrities' who
had a significant effect on newscast ratings."  (*Id.* at p. 1515.)  Here, nothing indicates
that plaintiff was a celebrity at any level or that his participation in producing a program
for CNN had any effect whatsoever upon the newscast ratings.

Similarly, with respect to plaintiff's ancillary role as an occasional writer[3] of
articles for CNN's Web site, nothing in the record indicates he had name recognition or
was otherwise "in the public eye."  Defendants argue, with respect to the defamation
cause of action, that "the millions of CNN and CNN.com viewers who have read
Wilson's many published stories would have an interest in accusations that he had
engaged in plagiarism."  However, neither the complaint nor any evidence submitted in
conjunction with the motion supports the notion that millions of people have read
plaintiff's stories.  Although the declaration of Manuel Perez states that seven to nine
million "unique domestic visitors" look at CNN's Web site daily, nothing indicates how
many people have read plaintiff's stories, let alone how many, if any, would recognize
his name or know who he was.  Defendants also cite plaintiff's awards, but, as far as the

---

[3] Plaintiff states in his declaration in opposition to defendants' motion that he
wrote approximately 200 such articles over the term of his employment with CNN, which
was approximately 18 years.  This averages approximately 11.1 articles per year, or less
than one per month.

record reveals, these reflect only peer recognition, not that plaintiff was so widely known as to be considered a person in the public eye.

Defendants' allegedly defamatory statements about plaintiff did not involve conduct that could affect large numbers of people beyond the direct participants. This was, instead, a private issue involving plaintiff, the defendants, and perhaps a small number of other CNN employees. As stated in *Donovan v. Dan Murphy Foundation* (2012) 204 Cal.App.4th 1500, 1509, "[P]rivate disputes between a small number of employees and a large, well-known employer do not involve a public issue or issue of public interest." An issue of public interest must "go beyond the parochial particulars of the given parties." (*Commonwealth*, *supra*, 110 Cal.App.4th at p. 34.)

Finally, defendants' allegedly defamatory statements about plaintiff did not involve a topic of widespread public interest. While plagiarism by an international news figure such as Fareed Zakaria might constitute an issue of public interest, plaintiff was a behind-the-scenes person the public probably had never heard of—a producer not seen on camera who also occasionally wrote articles for CNN.com. The record does not reflect any widespread public interest in whether plaintiff lifted phrases from other news reports when composing a Web article that was never published. " 'The fact that "a broad and amorphous public interest" can be connected to a specific dispute is not sufficient to meet the statutory requirements' of the anti-SLAPP statute. [Citation.] By focusing on society's general interest in the subject matter of the dispute instead of the specific speech or conduct upon which the complaint is based, defendants resort to the oft-rejected, so-called 'synecdoche theory of public issue in the anti-SLAPP statute,' where '[t]he part [is considered] synonymous with the greater whole.' [Citation.] In evaluating the first prong of the anti-SLAPP statute, we must focus on 'the *specific nature of the speech* rather than the generalities that might be abstracted from it.' " (*World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1570.)

Moreover, the record establishes that plaintiff's alleged "plagiarism" underlying the allegedly defamatory statement did not consist of large-scale copying of another's

16

unique work embodying original research, but merely using a few of the same or similar phrases or sentences regarding accurate background information taken from press releases and a press conference. Although defendants contended in their motion that they discovered more "plagiarized" articles by plaintiff in their audit, the sole basis for plaintiff's defamation cause of action was the statement that plaintiff had plagiarized portions of the Baca story. The other articles are therefore irrelevant to whether the defamation cause of action was properly stricken pursuant to section 426.16.[4]

Finally, defendants' alternative argument that Baca's retirement was the topic of widespread public interest misdirects the proper focus. The correct inquiry is whether "[t]he *statement or activity precipitating the claim* involved a topic of widespread public interest." (*Commonwealth*, *supra*, 110 Cal.App.4th at p. 33, italics added.) The statement precipitating plaintiff's defamation claim was that plaintiff had plagiarized passages in the Baca article, not that Baca was retiring or why. The focus of defendants' statement was a private controversy, not the public interest. (*Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 936.) Moreover, "it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 898.) Defendants' allegedly defamatory statement to the effect that plaintiff plagiarized passages in the Baca article in no way contributed to public debate regarding Baca's retirement. Defendants' statement was entirely collateral to the issue of Baca's retirement and was not made to the public.

---

[4] While plaintiff's conduct may or may not have been an acceptable practice at CNN and may or may not have constituted a legitimate, nondiscriminatory, nonretaliatory reason for his termination, it was not so grave or scandalous as to make it a topic of widespread public interest. Defendants' attempt to demonstrate widespread public interest in plaintiff's unpublished Web article by reference to public interest in Rolling Stone magazine's retraction of its "*A Rape on Campus*" article after its truth became dubious is inapt. The publication of a false article is far more egregious and scandalous than using a few of the same or similar phrases or sentences regarding accurate background information taken from press releases and a press conference in an *unpublished* Web article.

17

Accordingly, the section 425.16 motion was improperly granted with respect to the defamation cause of action as well.

## DISPOSITION

The judgment is reversed.  Plaintiff is awarded his costs on appeal.

CERTIFIED FOR PUBLICATION.


                                                    LUI, J.

I concur:


CHANEY, J.

18

ROTHSCHILD, P. J., dissenting:

I respectfully dissent.

Under the first prong of the anti-SLAPP statute, the defendants must establish that the challenged causes of action arise "from any act of [the defendants] in furtherance of the [defendants'] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (Code Civ. Proc., § 425.16, subd. (b)(1).) Here, there is no dispute that when CNN reports the news to the public it is exercising its right of free speech under the First Amendment. (See *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 164.) Acts that help advance or assist CNN in the exercise of that right are "acts in furtherance of the right of free speech" for purposes of the anti-SLAPP statute. (See *Collier v. Harris* (2015) 240 Cal.App.4th 41, 49; *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143.) If such act[s] are made "in connection with a public issue or an issue of public interest," they constitute "protected activity" for purposes of the anti-SLAPP law. (Code Civ. Proc., § 425.16, subd. (e)(4); *Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

In *Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510 (*Hunter*), Division Seven of this Court held that the decision by the owner of a television news show (CBS) not to hire the plaintiff as the show's on-air weather anchor constituted protected activity under the first prong of the anti-SLAPP statute, regardless of whether the decision was allegedly based on unlawful age and gender discrimination. CBS's selections of its weather anchors, the court explained, "were essentially casting decisions regarding who was to report the news on a local television newscast, [which] 'helped advance or assist' " the reporting of the news and the creation of a television show, "both forms of First Amendment expression." (*Id.* at p. 1521.)

Here, the evidence produced in connection with the anti-SLAPP motion reveals that Wilson had a more substantial and significant role in helping to advance and assist

in reporting the news at CNN than the on-air weather reporter in *Hunter*.[1]  According to Wilson's declaration, he "produced a wide range of stories, investigative reports, and live remote coverage, including breaking news, political coverage, and documentary programs."  Among other news events, he covered the 2012 election, "tornadoes in Wisconsin and Moore, Oklahoma, the rampage of cop-killer Christopher Dorner, mass shootings in California, Colorado, and Arizona, wildfires in seven western states, and documentaries on Michael Jackson and Rodney King."  He wrote and produced daily reports on Hurricane Katrina, produced live coverage of the September 11, 2001 terrorist attacks, produced field coverage of the Florida recount in the 2000 presidential election and the Supreme Court's ruling in *Bush v. Gore*,[2] and contributed "original stories, breaking news and companion pieces to support reporter packages" to CNN.com.

Wilson states that he has "received more than two dozen journalism awards for breaking news, investigative reporting, and documentary programs, including Emmy Awards . . . ; two Associated Press Awards; a Gracie Award; a Vision Award from NAMIC (National Association for Multi-Ethnicity in Communications); and the International Documentary Association award."  He was also "part of the CNN team honored with a George Foster Peabody Award for coverage of Hurricane Katrina."

Wilson's duties as a "Producer I" initially included:  "[w]orking with correspondents and managers to carry out and generate story ideas for air; researching;

---

[1]  "In deciding whether the initial 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' ([Code Civ. Proc.,] § 425.16, subd. (b).)" (*Navellier*, *supra*, 29 Cal.4th at p. 89; see also *Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1389 [the "court reviews the parties' pleadings, declarations and other supporting documents to determine what conduct is actually being challenged"].)  Courts "do not consider the veracity of respondents' allegations" at this stage (*Castleman v. Sagaser* (2013) 216 Cal.App.4th 481, 493), but do "accept plaintiffs' *evidence* as true for purposes of [the court's] analysis" (*Freeman v. Schack* (2007) 154 Cal.App.4th 719, 733, italics added.)

[2]  *Bush v. Gore* (2000) 531 U.S. 98.

news gathering; producing live shots for air; post-production; and writing for the CNN Wire desk (later called CNN.com)." After he was promoted to "Producer II" in 2003, Wilson "began pitching and producing long-form documentary programs" and "focused more and more on breaking news, political coverage, and documentary programs." He notes that he "was not a reporter on air and had only one brief interview as a reporter where [he] was actually shown on TV." He did, however, write "approximately 200 articles for publication while at CNN."

In support of its anti-SLAPP motion, CNN submitted the declaration of Terence Burke, the Vice President of Domestic Newsgathering for CNN. Burke stated that Wilson was a field producer "responsible for researching, producing and writing news stories for CNN and CNN.com." Field producers "are expected to investigate and gather all relevant facts and information about [an assigned] story, including by making calls to and inquiries of witnesses and other interested parties, finding video or photographs that relate to the story, reviewing the wire copy, and collecting other information related to the story. . . . The field producer then uses all of the information gathered as well as his or her own background, experiences, creativity and skill, to write an original news story." The "public's perception of a news story," Burke stated, "is shaped, in part, by the producer who wrote the story."

Another CNN representative, Richard Griffiths, explained that field producers such as Wilson submit their stories "to the 'Row,' " where "editors and editorial supervisors will assess the value of the story and review it for accuracy, structural issues, fact checking, timeliness, clarity, grammar and otherwise ensure that it meets CNN's standards for news reporting."

The evidence establishes that Wilson had a significant role in shaping and reporting the news. He researched, wrote, and produced stories for CNN television and CNN's website, and was expected to use his experience, creativity, and skill to shape the public's perception of the news. His work, in short, significantly impacted the content of the news reported to the public. His extensive list of prestigious journalism awards indicate that his contributions to the field were widely and repeatedly recognized.

3

Without diminishing the importance of the work of local weather reporters, the evidence indicates that Wilson "helped advance or assist" the First Amendment activity of news reporting in ways far more substantive and meaningful than the actions of the on-air weather reporters that were the subject of *Hunter*. Thus, if the employment decision of hiring a weather anchor in *Hunter* "qualifies as an act in furtherance of the exercise of free speech," so do the employment decisions concerning the work of a CNN news producer such as Wilson. (*Hunter*, *supra*, 221 Cal.App.4th at p. 1521.)

The majority, however, concludes that if CNN's actions are covered by the first prong of the anti-SLAPP statute, it will have a "special immunity from generally applicable laws." (Maj. opn. *ante*, at p. 13.) This point, like a similar argument rejected in *Hunter*, is "predicated on the 'fallacy that the anti-SLAPP statute allows a defendant to escape the consequences of wrongful conduct by asserting a spurious First Amendment defense. [Citation.] In fact, the statute does not bar a plaintiff from litigating an action that arises out of the defendant's free speech or petitioning [citation],' nor does it confer 'any kind of "immunity" ' on protected activity. [Citation.] Instead, under Code of Civil Procedure section 425.16, a plaintiff may pursue a discrimination claim or any other cause of action based on protected activity if he or she is able to present the 'minimal' evidence necessary to demonstrate a reasonable probability of prevailing on the merits." (*Hunter*, *supra*, 221 Cal.App.4th at p. 1525.) The anti-SLAPP law thus provides no exception to laws protecting employees from unlawful discrimination. When the anti-SLAPP law applies, it only requires the plaintiff to show that the lawsuit has some " 'minimal merit' " before proceeding. (*Hunter*, *supra*, 221 Cal.App.4th at pp. 1525-1526.) It does not require dismissal of the case. Although the anti-SLAPP statute places an additional burden on these plaintiffs, that burden is equally placed on every other plaintiff whose case comes within the scope of the anti-SLAPP statute. Indeed, if the requirement that a plaintiff make a prima facie showing excused every case from the anti-SLAPP law, the entire anti-SLAPP law would be eviscerated.

The majority rejects *Hunter* and relies on *Nam v. Regents of the University of California* (2016) 1 Cal.App.5th 1176. *Nam* involved allegations by a U.C. Davis

Medical Center resident that her supervisors had sexually harassed her and unlawfully retaliated against her because she rejected a sexual overture from the residency program director and publicly challenged the medical center's policies. (*Id.* at pp. 1180-1182, 1192.) The defendants argued that her causes of action arose out of statements made during a disciplinary process, which was an " 'official proceeding authorized by law' " under the anti-SLAPP statute. (*Id.* at p. 1186.) The *Nam* court agreed with the plaintiff that her causes of action arose not from the defendants' investigation, but from "its harassment and retaliation." (*Id.* at p. 1187.)

Aside from its significant factual differences from the present case, *Nam* is unpersuasive because it engaged in precisely the type of analysis our Supreme Court and Courts of Appeal have insisted must not be done. Specifically, the court conflated the first prong analysis, in which the court determines whether the alleged injury-producing act was in furtherance of the defendant's right of petition or free speech, and the second prong analysis, which consider the merits of the cause of action. By considering the merits of whether the defendant's acts were unlawful—i.e., whether they were discriminatory, harassing, or retaliatory—the court "confuse[d] the threshold question of whether the SLAPP statute applies with the question whether [the plaintiff] has established a probability of success on the merits." (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305, fn. omitted; see also *Navellier*, *supra*, 29 Cal.4th at p. 94; *Sprengel v. Zbylut* (2015) 241 Cal.App.4th 140, 156; *Hunter*, *supra*, 221 Cal.App.4th at pp. 1522-1523; *Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 268; *Coretronic Corp. v. Cozen O'Connor*, *supra*, 192 Cal.App.4th at pp. 1389-1390; *Birkner v. Lam* (2007) 156 Cal.App.4th 275, 285; *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1234.)[3] The majority in this case makes the same mistake.

---

[3] The only exception recognized by our Supreme Court for considering the legitimacy of the defendant's conduct in the analysis of the first prong is when "the defendant concedes, or the evidence conclusively establishes, that the assertedly

5

In *Hunter*, for example, the court rejected the plaintiff's effort to "confuse[]" the analysis of protected activity by conflating the conduct underlying the plaintiff's claim (the failure to hire the plaintiff) with the allegedly unlawful discriminatory motive. (*Hunter*, *supra*, 221 Cal.App.4th at pp. 1522-1523.) Courts, *Hunter* explained, " 'must be careful not to conflate such separate and distinct questions.' " (*Hunter*, *supra*, 221 Cal.App.4th at p. 1523; accord *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65, 83, disapproved on another point in *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 687.) Here, Wilson and CNN agree on the importance of keeping CNN's motives for its actions out of the first prong analysis, with each insisting that we must focus "squarely on the defendant's activity that gave rise to its asserted liability . . . rather than on any motive the plaintiff may be ascribing to the activity." Nevertheless, the majority rejects the position of both parties, as well as the weight of authority, and expressly conflates, in its first prong analysis, CNN's alleged discriminatory motive and the conduct upon which Wilson's action is based.

The *Nam* court explained that failing to consider the merits of the plaintiff's claims as part of the first prong analysis "would subject most, if not all, harassment, discrimination, and retaliation cases to motions to strike." (*Nam*, *supra*, 1 Cal.App.5th at p. 1189.) The statement, which the majority repeats, is incorrect. First, only those causes of action—regardless of their nature—that arise from acts "in furtherance of the [defendant's] right of petition or free speech . . . in connection with a public issue" would be subject to an anti-SLAPP motion. (Code Civ. Proc., § 425.16, subd. (b)(1).) Moreover, as to the cases that do arise from such acts, the fact that the cause of action is "subject" to an anti-SLAPP motion does not mean that it will be stricken; it merely means that the court will then engage in the second prong analysis to evaluate whether it

_____

protected speech or petition activity was illegal as a matter of law." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 320.) This exception does not apply here.

6

has the minimal merit necessary to proceed.  Thus, "the statute poses no obstacle to suits that possess minimal merit."  (*Navellier*, *supra*, 29 Cal.4th at p. 93.)

*Hunter* is also instructive on the question whether CNN's decisions concerning Wilson's employment were made in connection with an issue of public interest.[4]  On this issue, the *Hunter* court explained that "the proper inquiry is not whether CBS's selection of a weather anchor was itself a matter of public interest; the question is whether [that decision] was 'in connection with' a matter of public interest."  (*Hunter*, *supra*, 221 Cal.App.4th at pp. 1526-1527.)  That is, even if the public is not interested in who CBS hired to report the weather, the public is interested in weather reports.  Therefore, "CBS's decisions regarding who would present those reports to the public during its broadcasts was necessarily 'in connection' with that public issue."  (*Id.* at p. 1527.)

In addition to reporting the weather, CNN reports all manner of news.  More particularly, we are concerned here with the public interest in the news stories that Wilson wrote, produced, and reported.  Wilson's stories, by his own account, concerned such matters as national elections, tornadoes, mass killings, wildfires, Hurricane Katrina, and the September 11, 2001 terrorist attacks, as well as popular documentaries.  The subjects of Wilson's body of work with CNN undeniably concern matters that are of interest to the public as much or more than local reports of the weather.  Just as employment decisions concerning the hiring of a weather anchor are made " 'in connection with' " issues of public interest, CNN's employment decisions concerning a news producer were made " 'in connection with' " issues of public interest. (*Hunter*, *supra*, 221 Cal.App.4th at p. 1527.)

In discussing Wilson's cause of action for defamation, the majority focuses on whether Wilson "was a celebrity" or "a figure in the public eye," or merely "a behind-the-scenes person the public probably had never heard of."  (Maj. opn. *ante*, at pp. 15-16.)  The public interest issue, however, does not turn on whether Wilson is a

---

[4]  As to Wilson's first six causes of action, the majority concludes without explanation that these causes of action do not "implicate . . . a matter of public interest." (Maj. opn. *ante*, at p. 14.)

public celebrity.  Regardless of whether the general public is aware of Wilson's name, CNN's actions and statements concerning him—a widely-honored news and documentary producer with one of the world's largest and most respected news organizations—are connected with a matter of public interest.

For all these reasons, I disagree with the majority's conclusion that the challenged employment decisions and alleged defamatory statement are not covered by the anti-SLAPP statement.  I would hold that a news organization's employment decisions concerning a person, like Wilson, who has an undisputedly central role on the content of the news concerns an act in furtherance of the organization's First Amendment rights and made in connection with issues of public interest.


ROTHSCHILD, P. J.

8